1  BINGHAM McCUTCHEN LLP
   DAVID M. BALABANIAN (SBN 37368)
2  JAMES SEVERSON (SBN 67489)
   ROBERT A. BRUNDAGE (SBN 159890)
3  J. LEAH CASTELLA (SBN 205990)
   PAIGE J. SWARTLEY (SBN 215340)
4  Three Embarcadero Center
   San Francisco, California 94111-4067
5  Telephone: 415.393.2000
   Facsimile: 415.393.2286
6
   Attorneys for Plaintiffs
7  SONOMA FALLS DEVELOPER, LLC, SONOMA
   FALLS LENDER, LLC and SONOMA FALLS
8  MANAGER, LLC

9
                    UNITED STATES DISTRICT COURT
10
                    NORTHERN DISTRICT OF CALIFORNIA
11

12
   SONOMA FALLS DEVELOPER, LLC,          No. C 01 4125 VRW
13 SONOMA FALLS LENDER, LLC and
   SONOMA FALLS MANAGER, LLC,            SECOND AMENDED COMPLAINT
14                                       FOR DECLARATORY RELIEF,
                 Plaintiffs,             BREACH OF CONTRACT, BREACH
15        v.                             OF THE COVENANT OF GOOD
                                         FAITH AND FAIR DEALING, AND
16 DRY CREEK RANCHERIA BAND OF POMO      UNFAIR BUSINESS PRACTICES
   INDIANS,
17
                 Defendant.
18

19
20        Plaintiffs Sonoma Falls Developer, LLC, Sonoma Falls Lender, LLC, and

21 Sonoma Falls Manager, LLC (collectively "Sonoma Falls") bring this action: (1) for a

22 declaratory judgment that defendant Dry Creek Rancheria Band of Pomo Indians (the "Tribe")

23 has breached its contractual obligations to Sonoma Falls; and (2) for damages resulting from

24 those breaches. Sonoma Falls complains against the Tribe as follows:

25                          **Nature of this Action**

26        1.    Sonoma Falls and the Tribe are parties to a series of definitive agreements

27 related to the development of casinos on the Tribe's reservation in Sonoma County, California.

28 Sonoma Falls is ready, willing, and able to perform pursuant to those contracts, but the Tribe has

                          SECOND AMENDED COMPLAINT

1 failed to honor its obligations to Sonoma Falls. Indeed, in direct contravention of the Tribe's
2 agreements with Sonoma Falls, the Tribe has entered into a casino-development contract with
3 Dry Creek Casino, LLC, (the "Dry Creek Agreement"), a 69% owned subsidiary of Nevada Gold
4 and Casinos, Inc. ("Nevada Gold"), which was formed by Nevada Gold for the express purpose
5 of developing a casino on the Dry Creek Rancheria.

6        2.     The Tribe's contractual obligations to Sonoma Falls prohibit it from
7 pursuing similar agreements with other entities. By entering into the Dry Creek Agreement, the
8 Tribe has violated its binding legal obligations to Sonoma Falls.

9        3.     Sonoma Falls brings this Complaint for a declaratory judgment setting
10 forth the parties' rights and obligations so that the Tribe will understand that it cannot ignore its
11 legal obligations to Sonoma Falls. Sonoma Falls also brings this Complaint to recover restitution
12 of its expenditures in reliance on its contracts with the Tribe and its damages for the injuries that
13 it has suffered as a result of the Tribe's failure to honor its contractual obligations.

14                                   **The Parties**

15       4.     Plaintiffs Sonoma Falls Developer, LLC, Sonoma Falls Lender, LLC, and
16 Sonoma Falls Manager, LLC, are Delaware limited liability companies. Advent
17 Communications & Entertainment Company, LLC ("ACE") and High Creek Gaming, LLC
18 ("High Creek") are the members of each of Sonoma Falls Developer, LLC, Sonoma Falls
19 Lender, LLC, and Sonoma Falls Manager, LLC.

20       5.     The Tribe is a federally recognized Indian tribe with a 75-acre reservation
21 near Geyserville, California (the "Reservation").

22                                **The 1999 Agreements**

23       6.     In the summer of 1999, ACE (now a member of Sonoma Falls) and the
24 Tribe began negotiating agreements for the development of a casino on the Reservation. On
25 August 7, 1999, ACE and the Tribe entered into a Letter of Intent (annexed as Exhibit 1 and
26 incorporated by reference), along with an Exclusive Negotiating Agreement (annexed as Exhibit
27 2 and incorporated by reference), that together laid out a multi-phase agreement for the
28 "[p]lanning, construction, development, financing, operation and management" of gaming on the

SECOND AMENDED COMPLAINT
2

1 Reservation, along with auxiliary facilities, and possible additional developments including a
2 hotel and entertainment center.

3       7. As soon as the Letter of Intent and the Exclusive Negotiating Agreement
4 were signed, the parties began to move forward with the planning and predevelopment work for
5 the casino project. In September 1999, ACE and the Tribe entered into a Loan Agreement and a
6 Promissory Note (together the "1999 Loan Agreements"), providing for ACE to lend the Tribe
7 up to $10 million. The 1999 Loan Agreements are annexed as Exhibits 3 and 4 and incorporated
8 by reference. Under these agreements, the loan included both advances by ACE to the Tribe and
9 project-related expenses incurred by ACE. The 1999 Loan Agreements provided that the loan
10 would be repaid with interest.

11       8. In 2000, with the Tribe's knowledge and agreement, ACE brought in High
12 Creek (which, with ACE, formed Sonoma Falls) to participate in the development efforts. ACE
13 assigned to Sonoma Falls Developer its rights under the Letter of Intent and the Exclusive
14 Negotiating Agreement. ACE assigned to Sonoma Falls Lender its rights under the Loan
15 Agreement and Note. The Tribe consented to these assignments. The assignment agreement is
16 annexed as Exhibit 5 and incorporated by reference.

17       9. Sonoma Falls and the Tribe also negotiated and later signed definitive
18 documents governing casino development on the Reservation. During the parties' negotiations,
19 the parties recognized a possibility that a casino might need to be open by May 15, 2001 in order
20 to preserve many of the Tribe's slot machine licenses. Because the elaborate casino facility
21 envisioned by the parties would not be completed by that date, the parties also negotiated
22 agreements relating to a possible interim casino that, if necessary, could be operational by
23 May 15, 2001. ACE had previously funded $1,569,250.00, which was used by the Tribe to
24 obtain the appropriate California licenses. Pursuant to the Agreements, ACE and Sonoma Falls
25 advanced substantial additional funds to the Tribe. These sums were subject to repayment under
26 the 1999 Loan Agreements.

27
28

SECOND AMENDED COMPLAINT

3

21445760.2/24095-0001

**The November 2000 Agreements**

10. On November 1, 2000, the negotiations between Sonoma Falls and the Tribe culminated in a series of seven written agreements (collectively, together with the Letter of Intent, the Exclusive Negotiating Agreement and the 1999 Loan Agreements, the "Agreements"). The Agreements include:

    a. The Sonoma Canyon Development Services Agreement, between Sonoma Falls Developer and the Tribe (the "Interim Agreement") (annexed as Exhibit 6 and incorporated by reference). This agreement provides the terms governing development and construction of an interim casino on the Reservation;

    b. The Sonoma Canyon Loan Agreement, the Promissory Note and the Security Agreement (collectively the "Interim Loan Agreements") (annexed as Exhibits 7, 8, and 9 and incorporated by reference), all between Sonoma Falls Lender and the Tribe. These agreements govern amounts lent to the Tribe first by ACE and subsequently by Sonoma Falls, as well as financing for an interim casino;

    c. The Sonoma Falls Development Services and Financing Agreement, between Sonoma Falls Developer and the Tribe (the "Development Agreement") (annexed as Exhibit 10 and incorporated by reference). This agreement provides for the development of a more elaborate gaming facility (the "Falls Casino") on a portion of the Reservation;

    d. The Sonoma Falls Management Agreement between Sonoma Falls Manager and the Tribe (the "Management Agreement") (annexed as Exhibit 11 and incorporated by reference). This agreement provides for the management of the Falls Casino;

    e. The Sonoma Falls Loan Agreement (the "Loan Agreement") between Sonoma Falls Lender and the Tribe (annexed as Exhibit 12 and incorporated by reference). This agreement provides for the financing of the Falls Casino;

    f. The Letter Agreement On Seeking Approval of Management and Development Agreement ("Letter Agreement"). This agreement (annexed as Exhibit 13 and incorporated by reference) was between Sonoma Falls Manager and Sonoma Falls Developer on

SECOND AMENDED COMPLAINT
4
21445760.2/24095-0001

1  the one hand, and the Tribe on the other.  It provides that the parties will use commercially

2  reasonable efforts to cause the Management Agreement and the Development Agreement to be

3  approved by the NIGC as soon as possible; and

4              g.    The Option Agreement for Purchase and Sale of Real Property

5  between Sonoma Falls Developer and the Tribe, dated November 1, 2000 (annexed as Exhibit 14

6  and incorporated by reference).  This agreement provides the Tribe an option to buy certain land

7  owned by Sonoma Falls Developer if Sonoma Falls terminates the casino project.

8                    **Federal Government Approval**

9         11.    Federal law requires that certain types of agreements between Indian tribes

10 and outside parties be approved by the National Indian Gaming Commission ("NIGC") or the

11 Bureau of Indian Affairs ("BIA").  The Development Agreement and the Management

12 Agreement required NIGC approval.  The Loan Agreement became effective only upon NIGC

13 approval of the Development Agreement and the Management Agreement.  All other agreements

14 alleged in this Complaint were valid without approval by the federal government.  For example,

15 the NIGC has specifically stated that the Interim Agreement and the Sonoma Canyon Loan

16 Agreement do not require its approval.

17                       **Agreements' Effects**

18        12.    The Agreements imposed critical obligations on the Tribe. To induce

19 Sonoma Falls to make the enormous expenditures required, the Tribe agreed in the Exclusive

20 Negotiating Agreement to negotiate and deal exclusively with Sonoma Falls.  In the same

21 agreement the Tribe agreed to hold in confidence all information provided or developed by

22 Sonoma Falls.

23        13.    The Tribe also agreed, in the 1999 Loan Agreements, the Interim Loan

24 Agreements, and the Loan Agreement, to repay Sonoma Falls' loans with interest.  Pursuant to

25 the 1999 Loan Agreements and the Interim Loan Agreements, these loans included advances

26 made to the Tribe and expenses incurred by Sonoma Falls on behalf of the project.  The Interim

27 Loan Agreement expressly obligated the Tribe to repay the loan with interest upon abandonment

28 of the project and written demand.

14. Both the Interim Agreement and the Development Agreement identified Sonoma Falls as the entity that would perform "**all** required development services", including the supervision, design, construction, furnishing, and equipping of both the interim and the permanent Casino. The Development Agreement imposes on the Tribe the obligation to delegate to Sonoma Falls **all** "day-to day responsibility to implement the decisions" of the Tribe with respect to the permanent Casino. Both agreements provided that Sonoma Falls would be compensated for the services it rendered.

15. The Management Agreement provided that Sonoma Falls would manage the permanent casino. It also provided that Sonoma Falls would receive a portion of the revenue from the permanent casino.

16. Finally, in the 1999 Loan Agreements, the Interim Agreement, and the Development Agreement, the Tribe agreed to exercise good faith and reasonable efforts to do what was necessary to complete the project. In the Interim Agreement and the Development Agreement, the Tribe agreed to take all actions necessary to ensure that the agreements remained in good standing at all times. In the Letter of Intent, the Tribe agreed not to unreasonably withhold or delay approvals and consents. Most tellingly, the Tribe expressly agreed to exercise diligence and good faith in submitting agreements to the NIGC and BIA for approval in the Letter of Intent, the Interim Loan Agreements and the Letter Agreement.

**Sonoma Falls Performs According To The Agreements**

17. Starting in 1999, first ACE and then Sonoma Falls undertook extensive efforts on behalf of the Tribe toward the commencement of development and successful completion of the casino project. With the Tribe's knowledge and consent, ACE and Sonoma Falls arranged for and financed consultants to undertake wide-ranging surveys, studies, and plans for casino construction, as well as financial budgets and projections relating to the development and operation of the casino project. In addition, in May 2000, ACE provided the funding for the purchase by the Tribe from the State of California of 1,250 slot machine licenses. To address an issue concerning access to the casino, ACE and Sonoma Falls, with the participation of the Tribe's then-chairman, negotiated on behalf of the Tribe with the owner of an adjoining property

1 concerning easement rights.  In addition, ACE purchased (and transferred to Sonoma Falls) another adjacent property, known as the Dugan Parcel.  ACE and Sonoma Falls also have invested, and lent to the Tribe, more than $10 million in connection with the casino project.

18.  As Sonoma Falls worked toward the development of the casino project, a potential environmental issue arose that delayed commencement of construction.  The Alexander Valley Association raised claims with National Marine Fisheries Service ("NMFS") and other governmental agencies that construction activity during the rainy season in a canyon on the Reservation, where the parties envisioned building the interim casino, might lead to a violation of the Endangered Species Act.  As a result of that claim and the ensuing discussions with NMFS and other environmental regulatory bodies, it became clear that construction of the interim casino would be delayed during the winter and spring of 2000.

19.  Faced with that delay, Sonoma Falls and the Tribe confronted the possibility that 1,250 of the Tribe's slot machine licenses might expire if a casino containing those slot machines were not in operation on the Reservation by May 15, 2001.  Accordingly, in December 2000, Sonoma Falls proposed erecting a temporary interim casino at the top of the hill on the Reservation, where construction would not be limited during the rainy season by the environmental concerns that had been raised about construction in the canyon.  The temporary interim casino would only operate for the four to six months that it would take to complete the planned casino.

20.  By the spring of 2001, the parties learned that they would not need to have a casino open and in operation by May 15, 2001 to preserve those slot machine licenses.  Apparently, a number of other California-based tribes had experienced delays in opening casinos.  As a result of those widespread problems and resulting political dialogue, it became clear that there would not be a 2001 deadline, and that the Tribe would have at least an additional 12 months in which to open a casino on the Reservation and keep the purchased slot machine licenses from expiring.  In light of that development, Sonoma Falls discussed with the Tribe moving forward with the canyon location as originally contemplated for the interim casino rather than proceeding first with a temporary hill-top facility.

SECOND AMENDED COMPLAINT

7

## The Tribe Disregards The Agreements

21. The Tribe incorrectly believed that the delay in constructing the temporary Casino provided it with an opportunity to re-negotiate the terms of the binding Agreements that it had with Sonoma Falls. The Interim Agreement, however, does not allow the Tribe to terminate the agreement unless Sonoma Falls "fails to cause the Completion Date to occur within four (4) years" of November 1, 2000.

22. Based on its flawed view of the contract, in January of 2001, the Tribe began extensive efforts to eviscerate its agreements with Sonoma Falls. Disregarding its contractual obligations to Sonoma Falls, the Tribe openly invited Nevada Gold and others (collectively the "Nevada Gold Group") to negotiate. While refusing to move forward with Sonoma Falls, the Tribe worked with the Nevada Gold Group and undertook numerous actions inconsistent with its obligations to Sonoma Falls, including investigating the structure for a competing casino facility, geotechnical testing on a site for such a casino, preliminary grading and drainage plans, test water drilling, preliminary engineering plans, a construction budget, and financial forecasts of results from the operations of such a casino. The Tribe and the Nevada Gold group are now constructing a casino on the Tribe's Rancheria. Indeed, on information and belief, the Tribe took a number of the studies and documents prepared in connection with the Sonoma Falls casino project — and paid for with funds advanced by ACE and Sonoma Falls — and improperly provided those materials to the Nevada Gold Group. Further, on information and belief, any casino venture between the Tribe and the Nevada Gold Group will use State of California gaming licenses paid for by Sonoma Falls.

23. Not only did the Tribe begin negotiating and building a casino on the Rancheria with another entity, which was prohibited by the agreements that the Tribe had entered into with ACE and Sonoma Falls, but also the Tribe failed to perform its obligations under the Agreements. For example, the Tribe failed to submit either the Management Agreement or the Development Agreement to the NIGC – despite its contractual promises to do so diligently, in good faith and as soon as possible, and despite repeated requests by Sonoma

Falls. Indeed, to this day the Tribe still has not submitted either agreement to the NIGC for approval.

24. The Tribe also began making unreasonable demands on Sonoma Falls as a condition of going forward with the Agreements. These demands were completely unsupported by the Agreements. For example, at one meeting on February 12, 2001:

- The Tribe demanded that Sonoma Falls immediately deposit $24 million into an escrow account for the benefit of the Tribe. However, the Agreements contain specific provisions relating to when funds would be lent to the Tribe, and Sonoma Falls had fully complied with those provisions. Accordingly, the Tribe's demand for a $24 million escrow fund was baseless and overreaching.

- The Tribe also demanded that Sonoma Falls immediately transfer the Dugan Parcel to the Tribe, for no additional consideration. However, the Agreements provide that the Dugan Parcel will be transferred only after the NIGC approves the Development Agreement and the Management Agreement, among other preconditions, and the Tribe had not even submitted those contracts to the NIGC.

- The Tribe also demanded that the Agreements be deemed cancelled and completely rewritten to increase the Tribe's control over all aspects of the casino project as well as to enhance the financial returns to the Tribe. However, all of those issues had been fully negotiated before the Agreements were approved by the Tribe and executed.

**The Nevada Gold Agreement**

25. The Tribe continued to pursue casino development with the Nevada Gold Group throughout the summer of 2001. On August 26, 2001, the Tribe, disregarding its existing obligations to Sonoma Falls, voted to proceed with a project with the Nevada Gold Group. On information and belief, the Final Execution Copy of the Development and Loan Agreement between Dry Creek Casino, LLC, and the Tribe contains provisions recognizing that Sonoma Falls has binding contracts with the Tribe for casino development, and that the new agreement could be construed as a violation of those contracts, *e.g.*, it obligates Nevada Gold and Dry Creek

SECOND AMENDED COMPLAINT

9

1  Casino, LLC, to pay as a development advance, all legal fees and expenses related to any
2  litigation that might arise as a result of the Tribe's violation of its obligations to Sonoma Falls.

3      26.    Nevertheless, searching for a way to present the Nevada Gold agreement
4  as somehow consistent with the Tribe's Agreements with Sonoma Falls, the Tribe apparently
5  intends to assert that the prospective Nevada Gold Group casino would be a temporary facility
6  that does not violate the Sonoma Falls Agreements, while at the same time stalling work with
7  Sonoma Falls through November 2004, and then claiming that the Sonoma Falls Agreements
8  have expired by their own terms. That scheme plainly violates the Sonoma Falls Agreements.

### The Tribe Misuses Its Gaming Commission

10      27.    Pursuant to the Tribe's Agreements with Sonoma Falls, Sonoma Falls and
11  affiliated individuals and entities filed gaming license applications with the Tribal Gaming
12  Commission in February 2001. Many of the individuals and entities that submitted applications
13  to the Tribal Gaming Commission have been approved and licensed by gaming regulators in
14  other jurisdictions in the United States and Canada.

15      28.    All members of the Tribal Gaming Commission are members of the Tribe.
16  On information and belief, the members of the Tribal Gaming Commission were appointed by
17  the Tribe's Board of Directors and membership on the Commission is controlled by the Board of
18  Directors. In July 2001, the Tribal Gaming Commission signaled the Commission's intention to
19  use the license approval process to support the Tribe's scheme to eviscerate the Sonoma Falls
20  Agreements.

21      29.    In August 2001, in light of the contract the Tribe purportedly entered into
22  with the Nevada Gold Group, Sonoma Falls and the other applicants wrote to the Tribal Gaming
23  Commission to indicate their intent to withdraw their gaming license applications without
24  prejudice, until there was some indication that the Tribe actually would move forward with
25  Sonoma Falls pursuant to the parties' Agreements.

26      30.    However, in an obvious effort to give the Tribe leverage against Sonoma
27  Falls, Vicki Wattles, a member of the Gaming Commission, wrote to Sonoma Falls on August
28  20, 2001, and again on October 1, 2001, refusing to agree that the gaming license applications

1  could be withdrawn.  In those letters, Ms. Wattles demanded additional information, and
2  implicitly threatened to deny the applications in furtherance of the Tribe's efforts to undermine
3  and destroy the Sonoma Falls Agreements.  Any denial would have to be reported on
4  applications by Sonoma Falls' principals to other authorities, and would significantly prejudice
5  their attempts to obtain other licenses.
6         31.   Sonoma Falls remains committed to its Agreements with the Tribe.
7  Sonoma Falls already has invested more than $10 million in the casino project, and believes that
8  a successful project substantially benefits all parties, bringing much-needed revenue and jobs to
9  the Tribe as well as a fair return on Sonoma Falls' investment.  However, all of those benefits are
10 being jeopardized by the Tribe's improper actions.  In order to restore the parties' dealings to the
11 proper course, Sonoma Falls respectfully asks that this Court determine that the Tribe's
12 Agreements with Sonoma Falls remain in full force and effect, that the Tribe has breached those
13 Agreements, and that the Tribe is obligated to work in good faith and exclusively with Sonoma
14 Falls pursuant to the Agreements, and to award Sonoma Falls damages resulting from the Tribe's
15 breaches of the Agreements.
16        32.   All conditions precedent under the contracts have been fulfilled.

**Sovereign Immunity, Exhaustion and Venue Waivers**

18        33.   The Tribe waived venue by agreeing in each Agreement to submit to suit
19 in any court of competent jurisdiction, and by removing this case from state court to this Court.
20        34.   The Tribe waived sovereign immunity and exhaustion of tribal-court and
21 tribal administrative remedies for this action.  The waivers include but are not limited to the
22 following:
23        a.   The Letter of Intent waived the Tribe's sovereign immunity and
24 exhaustion of tribal court and administrative remedies for any claim under it or under any of the
25 final documents later signed.
26        b.   The Exclusive Negotiating Agreement waived sovereign immunity
27 and consented to jurisdiction in any court of competent jurisdiction with respect to any claim
28 under it.

SECOND AMENDED COMPLAINT
11

        c.       The 1999 Loan Agreements waived sovereign immunity and exhaustion of tribal-court and tribal administrative remedies with respect to any claim under them.

        d.       The Option Agreement waived sovereign immunity and exhaustion of tribal-court and tribal administrative remedies, with respect to any claim by any Sonoma Falls entity arising out of it or any related agreement.

        e.       The Interim Agreement waived the Tribe's sovereign immunity and exhaustion of tribal-court and tribal administrative remedies with respect to any claim by Sonoma Falls Developer or Sonoma Falls Lender, whether such claims arose out of the Interim Agreement, out of any associated agreement, or out of any actions of the Tribal Gaming Agency (also known as the Tribal Gaming Commission).

        f.       The Interim Loan Agreements waived the Tribe's sovereign immunity and exhaustion of tribal-court and tribal administrative remedies with respect to any claim by Sonoma Falls Lender, whether arising out of the Interim Loan Agreements, out of any associated agreement, or out of any actions of the Tribal Gaming Agency.

        g.       The Tribe voluntarily invoked this Court's jurisdiction by removing this action from state court to this Court.

35.       Exhaustion of tribal-court remedies is not required. The Tribe waived such exhaustion in the Agreements. In addition, the Tribe does not have functioning trial and appellate courts with jurisdiction over this dispute; this dispute presents primarily issues of state and federal, not tribal, law; and to Sonoma Falls' knowledge, no related proceeding is pending in any tribal court.

36.       The Tribe's Agreements with Sonoma Falls expressly waived exhaustion before all tribal tribunals. In any event, exhaustion of Tribal Gaming Commission licensing remedies is not required. Licensing is not a prerequisite to the relief sought in this Action. Indeed, exhaustion would be futile because the Gaming Commission lacks the power to award the relief sought. The Gaming Commission has also unreasonably delayed action on Sonoma Falls' license applications.

SECOND AMENDED COMPLAINT

12

37.  The Gaming Commission is also structurally and actually biased. Every member of the Gaming Commission is a member of the Tribe. If the license proceedings affect this lawsuit, every member has a pecuniary interest in denying the license applications. The Gaming Commission has further demonstrated actual bias, for example by prolonging the licensing process and using that process to provide leverage for the Tribe against Sonoma Falls.

## COUNT I

## DECLARATORY JUDGMENT

38.  Sonoma Falls re-alleges and incorporates by reference paragraphs 1 through 37 hereof as though fully set forth herein.

39.  The Agreements between Sonoma Falls and the Tribe are valid and binding contracts that remain in full force and effect.

40.  Both the Development Agreement and the Management Agreement provide, among other things, that the parties "agree to use their best efforts and to act in good faith in dealing with one another pursuant to this Agreement." Those contracts further provide that the parties' obligations of best efforts and good faith "will be interpreted under a standard of commercial reasonableness."

41.  The Tribe has breached the Agreements by, among other things:

    a.  abandoning and repudiating the Agreements

    b.  failing to take actions required by the Agreements

    c.  negotiating and entering into an agreement with the Nevada Gold Group, and sharing confidential information with that group, directly contravening the Exclusive Negotiating Agreement and other Agreements;

    d.  abusing the functions of the group that purports to be the Tribal Gaming Commission to prolong the licensing process, obtain leverage over Sonoma Falls, and attempt to limit liability in this dispute, all in violation of the Tribe's repeated agreements to act reasonably and in good faith and not to withhold or delay consents unreasonably;

SECOND AMENDED COMPLAINT

13

    e. refusing to repay the sums advanced to the Tribe and expenses incurred by Sonoma Falls, with interest, in violation of the 1999 Loan Agreements and Interim Loan Agreements;

    f. refusing to submit the Development Agreement and the Management Agreement to the NIGC for approval, in violation of the Letter of Intent, Interim Loan Agreements, Letter Agreement and other Agreements;

    g. failing to perform the Development Agreement and Management Agreement, which had not been approved by the NIGC because the Tribe had wrongfully refused to submit them;

    h. failing to perform the Loan Agreement, which had not become effective because of the Tribe's own wrongful refusal to seek NIGC approval of the Development Agreement and Management Agreement;

    i. failing to use good faith and reasonable efforts to do what was necessary to complete the project, in violation of the 1999 Loan Agreements, the Interim Agreement, and the Development Agreement; and

    j. failing to act in good faith toward Sonoma Falls.

  42. Sonoma Falls has fulfilled all of its duties under the Agreements with the Tribe.

  43. There is an actual controversy concerning the validity of the Agreements, Sonoma Falls' rights under the Agreements, and the Tribe's duties pursuant to the Agreements. Unless this controversy is promptly resolved, the interests of Sonoma Falls, and indeed the interests of the Tribe itself, will be greatly prejudiced. There are, at the present time, a large number of Native American tribes in California poised to enter the gaming industry as a result of recent changes in California law. In addition, 1,250 slot machine licenses might be in jeopardy if a casino is not operating on the Reservation by mid-year 2003. Further delay in determining how, and with whom, the Tribe will develop its casino project is likely to render that project unviable.

SECOND AMENDED COMPLAINT
14

1        WHEREFORE, plaintiff Sonoma Falls requests that this Court enter judgment in
2 favor of Sonoma Falls and against the Tribe:
3        (a)    declaring that the Agreements are valid and binding and that the
4 Agreements remain in full force and effect;
5        (b)    declaring that the Tribe has breached the Agreements;
6        (c)    declaring that the Tribe is not entitled to negotiate or enter into agreements
7 relating to a casino with the Nevada Gold Group or anyone other than Sonoma Falls and its
8 affiliates;
9        (d)    declaring that the Tribe has an obligation to work in good faith and
10 exclusively with Sonoma Falls pursuant to the Agreements;
11        (e)    declaring that the gaming license applications submitted by Sonoma Falls
12 and affiliated individuals and entities are deemed to be withdrawn without prejudice;
13        (f)    awarding Sonoma Falls its costs and attorneys' fees in connection with this
14 proceeding in accordance with the agreements between the parties; and
15        (g)    granting such other and further relief as this Court deems just and proper.

## COUNT II

## BREACH OF CONTRACT

18        44.    Sonoma Falls re-alleges and incorporates by reference paragraphs 1
19 through 44 hereof as though fully set forth herein.
20        45.    The Agreements between Sonoma Falls and the Tribe are valid and
21 binding contracts.
22        46.    Both the Development Agreement and the Management Agreement
23 provide, among other things, that the parties "agree to use their best efforts and to act in good
24 faith in dealing with one another pursuant to this Agreement." Those contracts further provide
25 that the parties' obligations of best efforts and good faith "will be interpreted under a standard of
26 commercial reasonableness."
27        47.    The Tribe has breached the Agreements as described in paragraph __ [42],
28 which is incorporated by reference.

1        48.    Sonoma Falls has fulfilled all of its duties under the Agreements with the Tribe.

2        49.    Sonoma Falls has been damaged by the Tribe's breaches of the Agreements in an amount to be proven at trial. These damages include, without limitation: the amounts due in repayment of loans under the Agreements, amounts expended by Sonoma Falls in reliance on the Agreements, and/or damages for lost profits from the Tribe's failure to perform the Agreements. If the Tribe proceeds to develop a casino with the Nevada Gold Group in contravention of the Agreements, Sonoma Falls will suffer additional and substantial damages.

## COUNT III

### BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING

50.    Sonoma Falls re-alleges and incorporates by reference paragraphs 1 through 50 hereof as though fully set forth herein.

51.    The Tribe, by negotiating an agreement with the Nevada Gold Group in deliberate disregard of its obligations to Sonoma Falls, breached the covenant of good faith and fair dealing contained in each of the Agreements.

52.    The Tribe further breached the covenant of good faith and fair dealing in each of the Agreements when it proposed outrageous terms to Sonoma Falls — terms that it knew Sonoma Falls would not agree to, and terms that were not contained in the binding agreements between the two parties — and threatened to ignore its obligations if Sonoma Falls did not agree to those terms.

53.    The Tribe further breached the covenant of good faith and fair dealing in each of the Agreements when it misused its control over Tribal Gaming Commission licensing to attempt to avoid its obligations under the Agreements and deny Sonoma Falls the fruits of the Agreements.

54.    The Tribe further breached the covenant of good faith and fair dealing in each of the Agreements when it refused to submit the Development Agreement and Management Agreement to the NIGC to attempt to avoid its obligations under those Agreements.

55. Sonoma Falls has been damaged by the Tribe's breach of the covenant of good faith and fair dealing in an amount to be proven at trial. These damages include, without limitation: the amounts due in repayment of loans under the Agreements, amounts expended by Sonoma Falls in reliance on the Agreements, and/or damages for lost profits from the Tribe's failure to perform the Agreements. If the Tribe proceeds to develop a casino with the Nevada Gold Group in contravention of the Agreements, Sonoma Falls will suffer additional and substantial damages.

## COUNT IV
## UNFAIR BUSINESS PRACTICES SECTION 17200

56. Sonoma Falls re-alleges and incorporates by reference paragraphs 1 through 43 hereof as though fully set forth herein.

57. The aforementioned actions of the Tribe constitute an unlawful, unfair, and/or fraudulent business practice in violation of California Business and Professions Code §17200 et seq.

WHEREFORE, plaintiff Sonoma Falls requests that this Court enter judgment in favor of Sonoma Falls and against the Tribe:

(a) awarding Sonoma Falls damages in an amount to be proven at trial;

(b) awarding Sonoma Falls damages for unjust enrichment for the Tribe's continuing use of plans and specifications, slot machine licenses, and other items paid for by Sonoma Falls;

(c) awarding Sonoma Falls restitution of sums advanced to the Tribe and of Sonoma Falls' expenses incurred on behalf of the project, in accordance with California Business & Professions Codes § 17203 and common law;

(d) imposing a constructive trust in favor of Sonoma Falls on: (i) sums advanced to the Tribe by Sonoma Falls under the Agreements and detained by the Tribe in violation of the Agreements; (ii) tangible and intangible property purchased by Sonoma Falls on behalf of the casino project and provided to the Tribe; and (iii) any proceeds of the foregoing;

1  (e) awarding Sonoma Falls quantum meruit for the reasonable value of services rendered, if any contract under which such services were rendered is deemed unenforceable;

4  (f) awarding Sonoma Falls its costs and attorneys' fees in connection with this proceeding in accordance with the Agreements between the parties; and

6  (g) granting such other and further relief as this Court deems just and proper.

DATED: August 15th, 2002

BINGHAM McCUTCHEN LLP

By: _____
David M. Balabanian
Attorneys for Plaintiffs
SONOMA FALLS DEVELOPER, LLC,
SONOMA FALLS LENDER, LLC and
SONOMA FALLS MANAGER, LLC

21445760.2/24095-0001